# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 22-0144V

|  |  |
|---|---|
| KELLY QUINN, | Chief Special Master Corcoran |
| Petitioner, | |
| v. | Filed: January 14, 2025 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Catherine Wallace Costigan, Maglio Christopher & Toale, PA, Washington, DC, for Petitioner.*

*Michael Joseph Lang, U.S. Department of Justice, Washington, DC, for Respondent.*

**DECISION AWARDING DAMAGES**[1]

On February 11, 2022, Kelly Quinn filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered injuries after a syncopal episode immediately after she received a Hepatitis A/B recombinant vaccination on March 27, 2019. Petition at ¶9-10. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters, and although entitlement was conceded in Petitioner's favor, the parties could not agree to a damages figure, and their dispute was therefore submitted to resolution at a "Motions Day" proceeding.

For the reasons described below, I find that Petitioner is entitled to an award of damages in the amount of $130,100.65, comprised of $130,000.00 for pain and suffering

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at  https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

and $100.65 for past unreimbursed expenses, plus the separate sum of $29,458.03 as reimbursement for a Maryland Medicaid lien.

## I.    Relevant Procedural History

Although Respondent conceded entitlement, the parties reached an impasse in their discussions regarding damages in December 2023. ECF No. 43. Petitioner filed a Memorandum in Support of Motion for Findings of Fact and Conclusions of Law Regarding Damages on February 15, 2024. ECF No. 44. Respondent filed a responsive brief on April 3, 2024. ECF No. 46. Petitioner filed a reply on April 9, 2024. ECF No. 47. I subsequently proposed that the parties be given the opportunity to argue their positions at hearing, at which time I would decide the disputed damages issues. ECF. No. 52. That hearing was held on December 19, 2024,[3] and the case is now ripe for a written determination.

## II.    Relevant Facts

### a.  *Medical Records*

Petitioner was 50 years old at the time of her vaccination. She had a prior history of lower back problems, including low back pain, scoliosis, a compression fracture, and MRI findings at L4-S1. Ex. 3 at 11. She also had a history of osteoporosis. Ex. 5 at 51.

Petitioner received a Twinrix (Hepatitis A/B) vaccine on March 27, 2019, in Baltimore, MD. Ex. 1 at 1-2. She was stable enough immediately after the vaccination for the administrator to leave the room. Ex. 5 at 39. The administrator heard, but did not see, Petitioner subsequently fall in the exam room. *Id*. When the administrator returned to the room, she found Petitioner on the floor, conscious, but lightheaded and dizzy. *Id*. Petitioner complained of pain, numbness, and an inability to move both arms. *Id*. She became nauseated and was taken to the emergency room for evaluation. *Id*.

The same day, Petitioner was transported by ambulance to the emergency room. Ex. 6 at 145. She reported her vaccination and the syncopal episode. Ex. 11 at 35. A CT of her c-spine revealed "a nondisplaced hairline fracture" in her C2 vertebrae. *Id*. at 39. Petitioner was admitted to the hospital, was given a cervical collar to wear at all times, and was prescribed medications. *Id.*

---

[3] At the end of the hearing held on December 19, 2024, I issued an oral ruling from the bench on damages in this case. That ruling is set forth fully in the transcript from the hearing, which is yet to be filed with the case's docket. The transcript from the hearing is, however, fully incorporated into this Decision.

The upper extremity symptoms caused the medical providers to believe that Petitioner "was likely to develop central cord syndrome from a hyperextension type injury mechanism," which Petitioner was diagnosed with on March 29, 2019. Ex. 11 at 52.

On March 29, 2019, Petitioner had a physical therapy evaluation while in the hospital. Ex. 11 at 59. She reported pain of 4/10. *Id.* at 60. Petitioner was wearing a cervical collar, was able to get out of bed, walked around, was able to go up/down steps, able to use the bathroom – and was determined to have had no acute PT needs. *Id*. at 61. Petitioner was discharged from the hospital with Flexeril and oxycodone. *Id*. at 29-30.

On April 2, 2019, Petitioner had a follow-up visit with her PCP. Ex. 5 at 23. She was wearing a hard cervical collar and reported that her boyfriend had been helping her with her daily activities. *Id*. at 24. She was prescribed gabapentin, a Medrol Dosepak, Flexeril, and oxycodone and referred to an orthopedist. *Id*.

On April 8, 2019, Petitioner saw her orthopedist with complaints of neck pain radiating to both arms and hands and balance issues that began after a fall at her doctor's office on 3/27/19. Ex. 8 at 57. She reported that initially she was unable to move her hands for several hours after she fainted. *Id.* She reported improvement in her hands since then, but that she still had dysthesias. *Id.* She reported that her balance problems began a few months ago – but that she was more unstable since the fall. *Id*. Petitioner was diagnosed with central cord syndrome in the setting of severe C3-4 and C4-5 cervical stenosis. *Id*. at 62. After discussing treatment options, Petitioner opted for surgical intervention to decompress the spinal cord. *Id*. The orthopedist noted that treatment for the fracture was the cervical collar. *Id*.

Petitioner had surgery on April 17, 2019. Ex. 7.2 at 10. After surgery, she was admitted to the ICU for monitoring. *Id*. at 17. The following day, April 18, 2019, Petitioner had an inpatient physical therapy evaluation after which she was discharged from the hospital. Ex. 7.2 at 44-51. She reported that the tingling in her arms was beginning to improve. *Id*. at 47. Petitioner was educated on proper techniques for standing, getting in and out of bed, etc. *Id*. at 48. Upon discharge, she was instructed not to bend or twist at the waist, not to lift more than 15lbs, and to keep her spine straight. *Id*. at 50. She was instructed to wear the cervical collar at all times. *Id*. at 55.

On May 30, 2019, Petitioner returned to her orthopedist for a six-week post-surgical follow-up. Ex. 5 at 5. Petitioner reported being overall pleased with her progress post-surgery. *Id*. She had continued issues with balance, a burning sensation in her neck, and tingling and weakness in her arms. *Id*. She was advised to continue wearing the cervical collar. *Id*.

Petitioner had additional cervical x-rays on July 11, 2019 and July 24, 2019 and lumbar x-rays on July 16, 2019.

On October 17, 2019, Petitioner returned to the orthopedist for a follow up appointment. Ex. 5 at 66. She reported that the numbness and tingling in her arms and hands had persisted. *Id*. The doctor noted that it was unclear whether the numbness/tingling would continue to improve. *Id*. at 6. She was instructed to follow up in six months.

Petitioner returned to her orthopedist on June 22, 2020. Ex. 5 at 63. She reported continuing numbness and tingling in her arms – but she had made excellent progress. *Id*. Petitioner reported that she had returned to sailing. *Id.* She was instructed to follow up in one year. *Id*. at 64.

More than two years later, on October 27, 2022, Petitioner reported continued hand numbness and weakness from her neck injury. Ex. 15 at 2. She was referred to orthopedic surgery. *Id*. at 4.

On November 23, 2022, Petitioner visited a psychiatrist and reported "being tired of being in pain from her neck." Ex. 14 at 27.

No further records were filed.

### b. *Affidavit Testimony*

Petitioner filed three declarations in support of her claim. *See* Ex. No. 9, 16, 21. She described her on-going symptoms, including hand numbness and "intermittent impulses where her hands open and she drops whatever she is holding." Ex. 16 at ¶2; Ex. 21 at ¶1. She noted that she has a permanent surgical scar on the front of her neck. Ex. 21 at ¶3.

As a result of her injury, Petitioner maintains, her handwriting has suffered and she can no longer do calligraphy or paint, that she can no longer exercise as she once did, and that her work as a dementia caregiver has been impacted. Ex. 16 at ¶3; 5-7. She also states that she has not sought further medical treatment because she understands that there is no further treatment that is likely to be helpful. Ex. 21 at ¶4.

### III.   The Parties' Arguments

### a. Petitioner

Petitioner seeks an award of $190,000.00 for her pain and suffering. Mem. At 13-17. She highlights her reports of high levels of pain, spinal surgery, and continuing

sequela, including hand numbness, reduced strength, and neck pain, to support her request. *Id*. Ms. Quinn also notes the impact her injury had on her ability to complete her job tasks and on her recreational activities. *Id*. at 17.

During the hearing and in her brief, Petitioner discussed prior syncope cases that involved injured claimants with awards ranging from $145,000.00 to $190,000.00, and argued that an award of $190,000.00 in pain and suffering was reasonable and appropriate in comparison. Mem. at 13-17. Petitioner also provided literature and argument regarding the impacts of central cord syndrome. *Id*.at 10-13.

### b. Respondent

Respondent proposes the lower award of $85,000.00 in pain and suffering. Resp. at 7. He describes Petitioner's injury as "limited in duration," with her "symptoms largely resolved within seven months." *Id*. He noted that Petitioner reported improvement after her surgery, and that she "had made excellent progress" and "had returned to pre-surgery activities like sailing" by her last medical visit on June 22, 2020. *Id*. at 8.

Respondent also distinguishes Petitioner's cited prior SIRVA cases, noting that all of them had longer treatment courses. Resp. at 10-12. Respondent also discussed prior syncope cases during the hearing with awards ranging from $45,000.00 to $100,000.00, and argued that an award of $85,000.00 in pain and suffering was reasonable and appropriate in comparison.

### IV.    Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional

distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Special masters may also consider prior pain and suffering awards to aid in determining the appropriate amount of compensation for pain and suffering in a case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The *Graves* court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

V.      **Appropriate Compensation in this Case**

a.  *Pain and suffering*

When determining pain and suffering awards, I review the entire record, including all filed medical records and affidavits and all assertions made by the parties in written documents and during oral argument. I also consider prior awards for pain and suffering in both prior SPU and non-SPU cases and rely upon my experience adjudicating these cases. However, I ultimately base my determination on the circumstances of this case.

In this case, there is no dispute of the Petitioner's pain awareness, and the parties generally agree on the course of treatment Petitioner experienced following her vaccination and syncopal episode. Petitioner was taken to the emergency room via ambulance after her fall and diagnosed with a cervical fracture. Ex. 6 at 45; Ex. 11 at 39. Her condition worsened and she was diagnosed with central cord syndrome, which necessitated surgery to repair. Ex. 8 at 57-62; Ex. 11 at 52. In addition to surgery, Petitioner was required to wear a cervical collar for ten weeks and required follow-up care, including additional x-rays. Ex. 5 at 5; Ex. 7.2 at 55; Ex. 8 at 62. Although Petitioner's course of treatment was not lengthy – approximately fifteen months (with the bulk of treatment in the first seven months)[5] – the records clearly reveal a serious injury to her neck and spine, followed by a good recovery, that justifies a substantial pain and suffering award.

Petitioner argues that she should be awarded $190,000.00 in pain and suffering for her vaccine injury. She cites to *Campbell v. Secretary of Health & Human Services,* No. 20-0381V, 2023 WL 1512589 (Fed. Cl. Spec. Mstr. Feb. 3, 2023), in which the petitioner received $190,000.00 in pain and suffering, and *Crawford v. Secretary of Health & Human Services,* No. 19-0198V, 2023 WL 5835058 (Fed. Cl. Spec. Mstr. Aug. 3, 2023), in which the petitioner received $145,000.00, to support her requested award. The *Campbell* case involved a petitioner who suffered a leg fracture that required three surgeries, caused her to be unable to work for one year, and caused documented ongoing pain and motion deficits. *Campbell*, 2023 WL 1512589 at *2-4. The *Crawford* case, in which the petitioner suffered a shoulder fracture that led to surgery, is more helpful; however, that claimant required inpatient rehabilitation for one month after his surgery,

---

[5] The duration of Petitioner's pain and suffering is the primary disagreement between the parties. Petitioner argues that she continues, five years after her vaccination, to experience neck pain, weakness in her arms, intermittent dropping of objects, and permanent scarring from her surgery. Respondent argues that the bulk of Petitioner's treatment was completed within seven months, after which she had one follow-up at fifteen months when she reported excellent progress, including a return to activities such as sailing. Thereafter, Petitioner had sporadic mentions of symptoms during treatment for other medical problems. I do find gaps in treatment significant and despite the initial severity of Petitioner's injury, the record does not contain evidence of significant ongoing problems.

nine physical therapy treatments, and suffered additional injuries, including a concussion, a pelvis fracture, and a compression injury to his spine. *Crawford,* 2023 WL 5835058 at *4. Both cases involve injuries more severe than Ms. Quinn's.

At the same time, the cases cited by Respondent in support of his suggested award were not particularly helpful. For example, Respondent cited *H.S. v. Secretary of Health & Human Services*, No. 14-1057V, 2015 WL 6155891 (Fed. Cl. Spec. Mstr. Sept. 25, 2015), an older case that did not involve surgery, and several cases involving accepted proffers, which are less useful than reasoned decisions due to the varied reasons that parties may choose a settlement. Although Respondent did not successfully defend his proposed number, he was successful in arguing that Petitioner's cited cases involved more severe injuries, and thus, pain and suffering awards that are too high.

I find Petitioner's situation to be similar to the Petitioner in *Hietpas v. Secretary of Health & Human Services.*, No. 19-1702V, 2021 WL 688620 (Fed. Cl. Spec. Mstr. Jan. 5, 2021) in which I awarded $140,000.00 in pain and suffering. The *Hietpas* petitioner suffered a syncopal episode that led to a fall, causing her to fracture her jaw (with dental injuries) and a laceration to her chin. *Id*. at *2-3. She required surgery to repair her jaw, stitches to her chin (leading to a permanent scar), and 18 months of treatment for TMJ. *Id*. In addition to her pain during treatment, Ms. Hietpas suffered from difficulty eating and speaking, had to forego activities, such as volleyball, and reported ongoing symptoms, including jaw pain. *Id.* at *3-5. Similarly, Ms. Quinn suffered a fall and a fracture, which required surgery and other treatment. She reported an inability to participate in activities, such as sailing, calligraphy, painting, and exercising, impacts to her handwriting and employment, and ongoing symptoms, including neck pain and upper extremity weakness. Despite the similarities, Ms. Hietpas's treatment lasted substantially longer – approximately two years – than did Petitioner's, which justifies a lower award herein, while still accounting for the significant impacts of the injury on Ms. Quinn's life.

Overall, considering the arguments presented by both parties at the hearing, a review of the cited cases, and the record as a whole, I find that **$130,000.00** in compensation for past pain and suffering (slightly lower than the award in *Hietpas*) is reasonable and appropriate in this case.

### b. Appropriate Compensation for Petitioner's Past Medical Expenses

Petitioner requests **$100.65 in past unreimbursed out-of-pocket expenses**. Mem. at 2. Respondent does not dispute this sum, and therefore Petitioner is awarded it without adjustment. Resp. at 2, fn. 1.

c. *Reimbursement of Medicaid Lien*

Petitioner reports that a Medicaid lien exists against her award in the amount of **$29,458.03**. Mem. at 2. Respondent does not dispute this sum, and therefore Petitioner is awarded it without adjustment. Resp. at 2, fn. 1.

Based on the above, I award Petitioner **$29,458.03** in compensation for satisfaction of the Maryland Medicaid lien for services rendered to Petitioner.

## Conclusion

In light of all of the above, the I award Petitioner the following:

- A lump sum of **$130,100.65**, representing $130,000.00 in pain and suffering and $100.65 in past unreimbursed expenses, to be paid through an ACH deposit to petitioner's counsel's IOLTA account for prompt disbursement; and

- A lump sum of **$29,458.03 in the form of a check jointly payable to Petitioner and Wellpoint Maryland, Inc., P.O. Box 659940, San Antonio, TX 78265-9939, Attention: Holly Fifarek.**

These amounts represent compensation for all damages that would be available under 42 U.S.C. § 300aa-15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[6]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[6] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.